NO. 23-1487

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

TERILYN WALLIS,

Plaintiff-Appellant,

v.

NATIONAL RURAL UTILITIES
COOPERATIVE FINANCE CORPORATION,

Defendant-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

**REPLY BRIEF OF PLAINTIFF-APPELLANT
TERILYN WALLIS**

Robert Scott Oswald
Anita Mazumdar Chambers
Briana Scholar
THE EMPLOYMENT LAW GROUP, P.C.
1717 K Street, NW, Suite 1110
Washington, DC 20006
(202) 331-2883
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
bscholar@employmentlawgroup.com

*Counsel for Plaintiff Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ III

ARGUMENT.................................................................................................... 1

I. Wallis has established the final prong of her *prima facie* case because when Kimsey and Wallis both presented with duplicate expenses, CFC only completed an internal review to dismiss Kimsey's expenses ................ 1

   A. Kimsey is a proper comparator because he was treated more favorably than Wallis in the original audit .............................................. 1

   B. CFC fails to explain why *Gary v. Facebook* is distinguishable and again conflates Wallis's burden to establish a *prima facie* case with its burden to proffer a legitimate business reason ...................................... 3

   C. The record does not reflect CFC treated employees equally regarding policies, workload, or communications about expense reimbursements ...... 7

      i. CFC treated male employees preferentially during their audit despite the audit sharing the same purpose as Wallis's.................................... 7

      ii. Justifying giving Wallis a larger workload than male employees because of her good performance does not negate the fact that CFC treated her differently.............................................................................. 9

      iii. CFC's common practice was to address expense report issues with male employees and its "interview" with Wallis was inadequate .......... 9

II. Wallis has provided enough evidence for a reasonable juror to infer her termination was motivated by discriminatory animus ............................... 11

   A. CFC argues it did not violate its own procedures despite Human Resources' lack of knowledge surrounding the reason for Wallis's termination............................................................................................ 11

   B. The record demonstrates that CFC's investigation was biased, flawed, and unfair............................................................................................ 12

      i. CFC exerted substantial control and influence over Persil's audit ....... 12

      ii. *Reeves* provides factors that the Court should consider when inferring discrimination.................................................................... 15

      iii. CFC mistakenly justifies the audit procedures using the audit results, an inherent post-hoc justification ...................................................... 18

i

C.  Wallis is properly disputing CFC's legitimate business reason ...............20

D.  CFC again relies on its biased audit results to justify its preferential treatment of male employees..................................................................22

III. Wallis has presented enough evidence of CFC's retaliatory motive to overcome summary judgment ...................................................................23

A.  CFC promulgated its own discriminatory allegations against Wallis, making the retaliation reasonably related to her administrative complaint ...............................................................................................23

B.  Wallis established a *prima facie* case of retaliation .................................23

C.  CFC's newly proffered legitimate business reason was waived in the lower court, and it cannot offer its own post-hoc justification based on "inferences" it is not entitled to .....................................................24

D.  CFC does not dispute that it violated its own policies and procedures, evidencing pretext, and concedes it did not present a legitimate business reason ......................................................................................................25

CONCLUSION .........................................................................................................27

CERTIFICATE OF COMPLIANCE....................................................................28

CERTIFICATE OF FILING AND SERVICE .....................................................29

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..................................................................22

*Ballengee v. CBS Broad., Inc.*,
   968 F.3d 344 (4th Cir. 2020)........................................................2

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000)......................................................23

*Cook v. CSX Transp. Corp.*,
   988 F.2d 507 (4th Cir. 1993)........................................................18

*Gary v. Facebook, Inc.*,
   822 F. App'x 175 (4th Cir. 2020) ...............................................3, 4

*Harris v. Reston Hosp. Ctr., LLC*,
   523 F. App'x 938 (4th Cir. 2013) ................................................23

*Haynes v. Waste Connections, Inc.*,
   922 F.3d 219 (4th Cir. 2019).......................................................22

*McDonnell Douglas Corp. v. Green*,
   411 U.S. 792 (1973)................................................................1, 21

*Sempowich v. Tactile Sys. Tech., Inc.*,
   19 F.4th 643 (4th Cir. 2021).........................................................2

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993)....................................................................21

*Texas Dep't of Cmty. Affs. v. Burdine*,
   450 U.S. 248 (1981)................................................................4, 21

*Tinsley v. City of Charlotte*,
   854 F. App'x 495 (4th Cir. 2021) .................................................3

## JUDICIAL RULES

Fed. R. App. R. 32(f) ...................................................................28

## OTHER AUTHORITIES

AICPA Forensic and Valuation Services Executive Committee,
   *Statement on Standards for Forensic Services, Forensic and Valuation*
   *Servs. Exec. Comm.* (Effective Jan. 1, 2020)...................................20

iii

# ARGUMENT[1]

## I. Wallis has established the final prong of her *prima facie* case because when Kimsey and Wallis both presented with duplicate expenses, CFC only completed an internal review to dismiss Kimsey's expenses.

### A. Kimsey is a proper comparator because he was treated more favorably than Wallis in the original audit.

CFC asserts that Kimsey is not a proper comparator to Wallis because "he did not commit fraud or violate CFC's policies, as she did." Appellee's Br. at 18. Again, CFC is attempting to muddle *McDonnell Douglas* burden shifting framework, asserting that its failure to review Wallis's expenses at the initial triggering audit is not relevant because Wallis allegedly committed fraud and Kimsey did not. CFC's conclusion that Wallis committed fraud and the validity of that reason is the *result* of its different treatment of Wallis. The legitimacy of CFC's proffered business reason is properly addressed in the pretext step of the analysis.

CFC then questionably opines that "the undisputed evidence conclusively demonstrates" Bradbury and Xu completed a double round review of Wallis's documentation, just like they did with Kimsey. This directly contradicts CFC's own testimony by representative Bradbury himself:

---

[1] On September 18, 2023, the district court issued an opinion but it was without jurisdiction to do so, and thus the opinion has no legal significance.

1

"Q: But why wasn't the check related to [the initial audit's incorrect duplicate] uncovered in you and [Xu's] initial review of the underlying documentation?

A: **We weren't finished with our review.** We decided to go through the entire review; in other words this would be in internal audit. We transitioned to CST, which reviewed a lot more data. We looked at all of the cash receipts records and only found that particular item. **So we weren't going to do that knowing we had a lot more expense items to test, rather than going back along the way** to see if it was reimbursed. [. . .]"

JA0994 (emphasis added).

Rather than review underlying documentation and finish its own internal review, CFC launched an external investigation with Persil that "reviewed a lot more data." *Id.* While CFC asserts that Wallis's two duplicate expenses had discrepancies during the initial audit and Kimsey's did not, it did not actually fully review Wallis's expenses and documentation (evidenced by the non-duplicative expense in that audit, discovered by Wallis). As CFC points out, "you would have no way of knowing if there were duplicate expenses" unless someone then examined the underlying documentation." Appellee's Br. at 21 (quoting JA0451–0452).

As CFC points out, the Court must make all "reasonable inferences in the light most favorable to the nonmoving party." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649 (4th Cir. 2021) (quoting *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020)). Based on CFC's own testimony, it is inherently reasonable to infer (if such 'inference' is needed in the first place) that Bradbury and Xu *had not*

2

*finished their review* before deciding to launch such an extensive audit, evidencing CFC's more favorable treatment of others outside her protected class. On these grounds alone, Wallis has presented sufficient evidence to establish her *prima facie* case and the existence of material facts in dispute, requiring remand for a trial on the merits.

Additionally, whether Kimsey is a proper comparator (which is typically framed as question of fact for the jury) or to what extent Wallis was treated differently than Kimsey are disputed material facts. *See Tinsley v. City of Charlotte*, 854 F. App'x 495, 501 (4th Cir. 2021) ("Although we typically frame the issue whether two individuals are similarly situated as a fact question, this does not preclude a court from deciding as a matter of law that there is an insufficient basis for comparison to submit the question to the fact-finder.").

### B.  CFC fails to explain why *Gary v. Facebook* is distinguishable and again conflates Wallis's burden to establish a *prima facie* case with its burden to proffer a legitimate business reason.

CFC asserts that the Court's holding in *Gary v. Facebook* is distinguishable because whether "Randall was a better employee" had nothing to do with whether Facebook failed to promote Gary because of his race, while Wallis's expenses have "everything to do with whether CFC terminated her based on her sex." Appellee's Br. at 22. Whether CFC terminated Wallis based on her sex (or Facebook promoted

Randall because he is a better employee) is properly addressed in the pretext stage – where she has "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256, (1981). Rather, when disputing the *prima facie* case, the final prong can be established from "evidence that the employer favored a comparator [outside the protected class] over the plaintiff." *Gary v. Facebook, Inc*., 822 F. App'x 175, 180 (4th Cir. 2020). Randall, who dealt with the same supervisors and held the same position, was treated better than Gary. *Id.* at 181. The reason for Facebook's treatment of Gary is its proffered legitimate business reason (Randall was a better employee). *Id.*

Likewise, Kimsey, who dealt with the same supervisors and held the same position, was treated better than Wallis. The reason for CFC's treatment of Wallis is its proffered legitimate business reason (alleging Wallis committed fraud). When attempting to distinguish *Gary*,  CFC itself states that Wallis "submitted dozens of false expense-reimbursement reports." Appellee's Br. at 22. Critically, this cannot *also* be why Kimsey is not a proper comparator when CFC failed to fully review Wallis's documentation *before* launching an extensive and biased investigation that concluded fraud.

Further evidencing CFC's conflation is its contention that it makes no difference whether it treated Kimsey preferentially during the initial audit because it

4

argues it would have discovered Wallis's "fraud" later on anyway. This is not a comparator analysis; this exact preferential treatment that CFC tries to dispose of establishes the final prong of Wallis's *prima facie* case. CFC thoroughly reviewed Kimsey's documentation for his flagged expenses, and not only did not do the same for Wallis, but initiated a far-reaching investigation based on its incomplete assumptions. CFC's assertion that Wallis's expenses were double reviewed by Bradbury and Xu is contradicted by the record and is a dispute of material fact that requires credibility consideration by a jury.

Next, CFC asserts the District Court judge was correct in her ruling that Wallis did not have a comparator because she had about 50 "fraudulent" expenses while males did not because this decision must have been based on the record "as a whole." While CFC is correct that judges must base their decisions on the record as a whole, the record does not support such a ruling. As explained *supra* and in Wallis's Opening Brief, the District Court misapplied the comparator analysis when considering the results of CFC's biased investigation rather than the discriminatory treatment when both Kimsey and Wallis were audited for duplicative expenses, but only Kimsey's were dismissed after a double round review. Opening Br. at 17-19. Additionally, CFC is arguing that the District Court made a factual finding – that it made its ruling "accounting for Wallis's extensive fraud." Appellee's Br. at 23. Not only is this construing facts in favor of the moving party, but whether CFC actually

believed that Wallis committed fraud is an issue for the fact-finder. Moreover, the record as a whole evidences discriminatory motive based on CFC's selectively flexible policies, better benefits for male employees, unequal distribution of work, and terminating Wallis for an issue that could have easily been resolved. *See infra* at 7-9; Opening Br. at 18-25. Notably, CFC did *not* even complete an initial verification of the alleged duplicate expenses into Wallis, and unlike males, did not allow for variances in its policies or ask Wallis for explanations when it identified these issues. Instead, CFC launched an extensive investigation into all of Wallis's expenses (including finances already routinely audited by CFC's internal processes in years prior, with no issues uncovered).

Finally, CFC argues that the timing of Persil's written reports (both after Wallis's termination) is irrelevant to the legality of Wallis's termination. This is incorrect because the District Court's ruling specifically referenced CFC's conclusion that Wallis had committed fraud at the time of her termination when holding she could not present a comparator – but Persil had not yet performed an audit on Kimsey or any other male RVP. JA0944. Moreover, while CFC points to testimony that Persil "already made the conclusion" that Wallis committed fraud at the time of her termination, Bradbury testified that he did not conclude that Wallis committed fraud until "the end of John Persil's forensic engagement on expenses," ostensibly when he completed his June 2018 adjusted final report, five months after

Wallis had been terminated. JA0627-0628, JA1048. Again, at a minimum, these are material disputed facts that should be decided by a jury.

**C.  The record does not reflect CFC treated employees equally regarding policies, workload, or communications about expense reimbursements.**

**i.  CFC treated male employees preferentially during their audit despite the audit sharing the same purpose as Wallis's.**

CFC argues that Wallis was audited more stringently than her male comparators because its internal audit department discovered that only she had submitted expense reports that were actually duplicative. This assertion is based on the faulty foundation that the internal audit had *reviewed* her expenses as it did with the males and confirmed these duplicates. *See supra* at 2. Nonetheless, it is an invalid argument because CFC did not subject the male employees to external auditing until *after* CFC's expansive testing into Wallis. CFC then audited these male employees because it believed "it really should look at comparators" to see if "there are any other issues, duplicate expenses, and so forth." JA0469-0470.

Comparing other RVPs expense reports would only make sense if the same stringent parameters applied to Wallis applied to the male employees; otherwise, these results are incomparable. By arguing that more lax parameters were acceptable when the males were audited *after* CFC incorrectly concluded that Wallis committed fraud, but before knowing whether the male employees did the same, CFC is implicitly acknowledging that it treated her differently. The males were audited for

7

the same purpose as Wallis, yet subject to far less scrutiny. In fact, the audit of all four male comparators was completed within a week because the "window of those expenditures was much narrow[er] than the window of T. Wallis." JA0692-0693.

Additionally, while CFC argues that there is no evidence of CFC turning a blind eye to policy violations, the evidence demonstrates otherwise. In addition to the examples provided in Wallis's Opening Brief (*see* Opening Br. at 22-23), the record reflects numerous additional policy violations that CFC condoned for male employees. For example, after a male employee was asked about a line item with no explanation in his $11,580 expense report, he explained that "I purchase[d] drinks for many of the WY coop ceo's, directors and spouses. **It was more like a bar sponsorship**." JA1243 (emphasis added). CFC's corporate travel policy states that "good judgment should be exercised by the employee to ensure that the amount of alcohol consumed is appropriate for a professional setting" JA0357. CFC's response to his explanation was, "Thanks Eric, this helps. Have a good one." *Id.* In contrast, before Persil even wrote a report, CFC terminated Wallis, and six months later, after two revisions, Persil concluded that six years of Wallis's expenses amounted to $14,030.01 of "multiple reimbursements." But unlike, Eric, a male at CFC, CFC did not provide her sufficient opportunity to explain the expenses and ignored Wallis after she was terminated when she submitted a reconciliation and her full personal credit card statements. JA0997. Taking all facts in the light most favorable to Wallis,

8

a reasonable juror could conclude that CFC was implementing is policy more favorably to males than Wallis.

Similarly, one male employee exceeded the $50 threshold for a reimbursable personal meal four times over the course of four days, escalating up to an $80 meal individually. JA0248-0249. CFC approved this exception because of the "expensive nature of the area," despite policy dictating that "employees should avoid having meals at expensive restaurants." *Id.*; JA0357. Making all reasonable inference in Wallis's favor, reasonable jury could find that this evidences discriminatory treatment.

### ii. Justifying giving Wallis a larger workload than male employees because of her good performance does not negate the fact that CFC treated her differently.

CFC attempts to justify Wallis's additional workload by saying it was for "good reasons." Appellee's Br. at 28. This is a bare assertion that its reasons for treating Wallis differently were simply not discriminatory and fails to rebut an inference of discrimination.

### iii. CFC's common practice was to address expense report issues with male employees and its "interview" with Wallis was inadequate.

CFC's argument that "what's done is done" when it comes to the submission of expense reports is unsupported by the record. While CFC notes that reports cannot be *un*submitted, CFC certainly allowed male employees to add to their submissions

after the fact so it could be paid out, evidencing submissions are not quite considered "done" at CFC. JA1243-1244.

It is also an unreasonable inference to assume that Persil wanted to "thoroughly and fairly" evaluate Wallis's reports considering the facts surrounding his interview with her: Persil already had "pretty good feeling" Wallis had committed fraud prior to the interview; it lasted less than twenty minutes; and Persil was "surprised that [he] didn't get detailed responses from her about each exhibit" that he brought (from an audit that spanned five years). JA0852, JA1094, JA1104-1106.  Further, there are disputes of material fact about this meeting as Wallis contends that CFC did not bring a single document for her to review at the meeting.

Even following Wallis's termination, she tried to properly address and resolve the issue because she did not commit fraud. CFC does not acknowledge that Wallis performed and gave CFC an extensive reconciliation of her expenditures and reimbursements to demonstrate to CFC that she had not committed fraud. JA0997, JA1336-1349.

10

## II. Wallis has provided enough evidence for a reasonable juror to infer her termination was motivated by discriminatory animus.

### A. CFC argues it did not violate its own procedures despite Human Resources' lack of knowledge surrounding the reason for Wallis's termination.

While CFC disputes the relevancy of the IDEA software and the hiring of Persil, these issues go to show that the manner, speed, and scope of the investigation and immediate termination was hasty, unpracticed, and arguably unprompted. As an employee at CFC, Wallis had been audited before and had never had issues. Any type of deviation from typical employer practices, especially deviations of such enormity, evidence a shift in the motive of the employer.

CFC then argues that Clendenen was a decisionmaker in Wallis's termination, yet Clendenen testified that she did not consider progressive discipline over termination because "those decisions were not [hers] to make." JA1226. CFC also acknowledges Clendenen's lack of involvement in the disparate audit process which led to Wallis's termination, even as it argues Clendenen provided guidance and input to Wallis's termination. Clendenen had no knowledge of any type of audit report or the disparate audit parameters between the male employees and Wallis. JA0757, JA1238.

CFC states it "made the difficult decision to terminate Wallis only after discovering that she had submitted over fifty fraudulent expense-reimbursement

11

reports." Appellee's Br. at 31. This is not possible. First, Persil had yet to complete his audit, meaning the total number of allegedly fraudulent expense submissions would have been unknown. Second, even if Persil had already come to a final number of allegedly fraudulent "reports," it would have been incorrect (the original 95 allegations, of which 41 were false).

CFC's post hoc rationalization does not even accurately reflect the information it itself claims it had at the time.

**B.  The record demonstrates that CFC's investigation was biased, flawed, and unfair.**

**i.  CFC exerted substantial control and influence over Persil's audit.**

CFC then moves to show that CFC's only role in Persil's audit was to supply data and answer his questions. Yet, CFC also: 1) instructed Persil on the scope of the audit, including the narrowed time frame and parameters for the comparators; 2) "collectively" (referencing "management, and the internal audit department" as well as Persil himself) determined Wallis committed fraud; 3) pulled the data using its own method that Persil did not question because he was "dealing with the internal auditors of the CFC, which carry credentials of their own;" and 4) provided Persil with the "master file" of Wallis's expenses, which Wallis has yet to receive; 5) worked "collectively on site for multiple days" and met almost daily; 6) submitted reports back and forth with Persil during the course of the audit; and 7) had to

"collectively" agree with Persil that a transaction would be considered a finding in the audit conclusions. JA0947, JA0957-0958, JA 1048-1049, JA1059, JA1069, JA1071, JA1073-1074, JA1083-1084. Persil described the analysis of the findings a "joint effort;" and CFC testified that it was "really a collaboration between internal audit and John Persil's firm." JA1026, JA1071. This is more than "supplying data, answering questions, and confirming discrepancies for itself." Appellee's Br. at 34. Simply put, Persil was not independent and worked in tandem with CFC.

Though it attempts to distance itself from the audit findings, at least some of CFC's findings were *copy and pasted* into Persil's expert report, specifically Exhibit 4, listing all alleged "fraudulent expense" (referenced on JA1118):

> "Q: Okay. Who prepared this expense report analysis document?
>
> A (Persil): I think this is a cut and paste of several other reports that was a combined effort of the internal auditors and myself."

CFC then disputes that the parameters (multiple reimbursements, mis-characterized, fictious, or overstated expense reimbursements) of the audit were different for Wallis and the male comparators. Here, again, CFC presents an argument in direct conflict with its own testimony:

> "Q: …Was it that John Persil looked to see if there was a**ny duplicate expenses for these four RVPs? Is that the only thing he was looking at for the four – the expenses of the four male RVPs**?

13

A: And also, there was documentation included – excuse me, supporting receipts for the expenses as well.

Q: Okay. Sorry. So is that a yes, **that's what he was looking for, is if there was duplicate expenses for the male RVPs?**

A: **Yes**."

JA0999-JA1000 (emphasis added).

Further, while CFC asserts that it did "no such thing" as going back and editing Persil's calculations, but instead merely *requested* that Persil remove expenses, CFC's testimony shows otherwise:

"Q: [. . .] It sounds like it -- it's John Persil's conclusions and his documentation, and **then you had this Excel report and then you updated it after Teri -- Teri's termination. Is that accurate?**

A: **We updated -- this was initially John's file.**

Q: Okay.

**A: So we're all operating within John Persil's Excel file.**

Q: Okay.

A: That contained everything you look at. His staff entered all the items that they had examined, documented their conclusions. There was a summary schedule to report that $19,169.45. We had found later that there was some adjustments made. **I actually updated the schedule to account for those adjustments. And that's what really precipitated that revised letter from CST to Hunton in June 15th.**"

14

JA0522-0523 (emphasis added).2

The updated report itself is titled as "Examination of Potential Asset Misappropriation of National Rural Utilities Cooperative Finance Corp (NRUCFC) as of June 15, 2018 **based on subsequent finding and decisions of the NRUCFC Internal Audit Department.**" JA1272 (emphasis added). The evidence plainly demonstrates that CFC had the control and authority to change the audit calculations and dictate the results.

### ii. *Reeves* provides factors that the Court should consider when inferring discrimination.

 CFC disputes the applicability of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), despite numerous factual parallels.

The first factor, wherein Reeves provided evidence that directly contradicted his employer's proffered business reason, is applicable because Wallis did exactly that. While CFC states that "credit card and bank statements" do not "change the fact that Wallis submitted over fifty reimbursement requests that were determined to be false," whether these reimbursement requests are false is highly disputed. Wallis provided her extensive reconciliation *with supporting documents* to demonstrate that

---

2 Persil's February 5, 2018, written report estimated the fraud to be approximately $85,260.10 but then drastically decreased in subsequent reports. JA1325-1331.

there was no such fraud, which (like Reeves) evidences the pretextual nature of CFC's proffered legitimate business reason.

The second factor, regarding an employer's faulty justification, is plainly applicable. CFC terminated Wallis without a final report, and later (after Wallis notified CFC of her intent to begin litigation) sought out its own numerous errors, suddenly significantly reducing the number and dollar amount of her alleged "fraud."

The third factor relates to Reeves's employer conceding that it used faulty equipment. This is relevant because the IDEA system was used to identify the pool of employees from which CFC picked the five employees in the initial audit. JA0911-0913. While the software is not sophisticated, it is also noteworthy that the internal audit department at CFC never received any training on finding fraud or interpreting results from the IDEA software. JA1015-1016. This system and the complete lack of training on how to handle it is, essentially, "faulty equipment." In other words, CFC used essentially a new compliance tool, which simply identified duplicates, to identify and conclude fraud.

The fourth factor in *Reeves* is also related to the lack of training at CFC. While, again, Wallis disputes that any presented transactions are "fraudulent" in any way, the fact that a corporation provides no training on constantly changing procedures and software – yet typically requires executives to use personal credit cards for all

16

business expenses adding up to several hundred thousands of dollars – is unreasonable on its face.

The fifth *Reeves* factor is significant because CFC *still* has not conclusively calculated how much Wallis allegedly "fraudulently obtained." *See infra* n.2. It has also not provided her with the opportunity to do so herself because it never gave her a complete record of her expense reports. JA1205. Here, CFC again argues that Persil had already concluded that Wallis committed fraud before it terminated her, and the later discovery of 41 errors totaling over $2,300 do not in any way demonstrate pretext.[3] While this alone may not "invariably lead to the inference that

---

[3] As a clarifying matter, CFC's assertion that the updated June 2018 audit report was a minor correction because 39 instances of "fraud" were attributable to one source (Verizon) is misleading. Appellee's Br. at 38, n.20. When CFC states that the change "lowered the asset misappropriation figure for that category by only $1,617.38," it neglects to mention that the original asset misappropriation figure for that *entire* category was $1,891.63. JA0746. Meaning, the asset misappropriation figure for that category was reduced nearly 86% percent with a remaining disputed figure of only $274.25 after these adjustments. JA0750. Even if one were to believe that the total number of allegations against Wallis is irrelevant (54 v. 95), the June adjustments reduced the overall "fraudulently obtained" dollar amount from $19,169.45 to $16,809.67, about 12.3% percent. JA0746, JA0750. Even when counting all 39 Verizon charges as a single error out of the original 95 (a total of 3 errors in a set of 95), Persil's error rate would still be around 3.1%, which is only 1% less than Wallis's. If all of the 39 Verizon charges were combined to be one instance instead of the original 95 instances (meaning, the total amount of instances would be 57 after subtracting 38 from 95, still including the other two errors corrected in the June report), this error rate jumps to 5.2%. This is not including the additional errors within the June report that were uncovered in the discovery phase of this litigation. JA1156-1157. Persil has been a certified public accountant since

17

CFC fired Wallis because of her sex," the Court must "consider the record as a whole," and, under *Reeves*, this is demonstrative of pretext. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993).

Each of these factors is salient and applicable to the facts here, and the Court should consider them as evidence of the pretextual nature of CFC's proffered legitimate business reason.

### iii. CFC mistakenly justifies the audit procedures using the audit results, an inherent post-hoc justification.

CFC's first contention related to the propriety of Persil's audit is that Wallis's error rate does not matter because it did not find any fraud by male employees, resulting in no error rate.[4] However, the *results* of a skewed and targeted audit—against the only female audited—cannot justify the propriety of the audit *procedures*.

As to Persil's failure to interview CFC's travel agency, CFC makes no argument that FCM was not relevant to the audit, but only claims that Persil was "very, very

---

1990; a certified fraud examiner since 2010; and is proffered as an expert in forensic audits by CFC. JA0643. Yet this error rate is still higher than Wallis's when reviewing her thousands of submissions over approximately six years.

[4] CFC notes that "no other employee (male or female) had a single penny [in fraudulent reimbursements]." No females were included in either the initial audit or the external audit. Wallis concedes that none of the females in these audits had disputed transactions.

conservative." Appellee's Br. at 40 (quoting JA0675). This fails to rebut or justify this pivotal flaw. According to CFC, the "record belies any such inference" that any of the alleged instances of fraud are improperly counted against Wallis. Yet Persil conceded a new mistake in the June 2018 report in the same deposition CFC cites to when it asserts that if he and his team "felt a transaction could not provide conclusive evidence, that transaction was removed." JA1156-1157, Appellee's Br. at 40 (quoting JA0675). The final June report is also missing documentation, including the actual expense reports for reimbursement for nearly all of the alleged duplicates. *See generally* JA0550-0660, JA1157, JA1324-1331.

Finally, CFC attempts to dismiss Persil's failure to investigate a sharp increase in "fraudulent" airline transactions at the same time CFC switched reimbursement software (and provided no training for this new system) as "unsupported speculation at best." Appellee's Br. at 41. In contrast, this is circumstantial evidence of a flawed investigation; the same year CFC overhauled its reimbursement system, Persil suddenly found repeated instances of what he deemed intentional fraud but failed to investigate further (despite his awareness that CFC switched expense submission software several times). JA1077-1078. Additionally, CFC does not address the fact that Persil, a forensic auditor examining an employee's reimbursements, was generally unaware of the mechanics and procedures of all three systems she used during her tenure to submit reimbursements. Opening Br. at 39-40.

19

**C.   Wallis is properly disputing CFC's legitimate business reason.**

CFC contradicts itself by arguing that Persil can render an opinion on the existence of fraud because he abided by the AICPA standard, stating that he can "render an opinion" based on facts, then confirming that "Persil opined that Wallis committed fraud." Appellee's Br. at 42. In contrast, the AICPA standard bars this exact action: "[t]he ultimate decision regarding the occurrence of fraud is determined by a trier of fact; therefore, a member performing forensic services is **prohibited from opining regarding the ultimate conclusion of fraud.**" *Statement on Standards for Forensic Services, Forensic and Valuation Servs. Exec. Comm.* 4 (2020) (emphasis added). These guidelines specifically note that this applies to investigation engagements, *not* just litigation in a court of law. *Id.* at 2. Forensic auditors can provide "expert opinions relating to whether evidence is *consistent with certain elements of fraud* or other laws based on objective evaluation," but under no circumstances should they conclusively state that an individual committed fraud. *Id.* at 4. Persil did exactly this, as stated throughout CFC's brief and perpetuated by CFC to others in the professional community. *See, e.g.*, Appellee's Br. at 38 ("Persil concluded, without any doubt, that Wallis committed fraud before she was fired.").

CFC further argues that, "The issue here is pretext, not one challenging the legal sufficiency of a conviction premised upon an intentional act." Yet, its legitimate business reason is exactly that – that Wallis outright committed fraud.

Appellee's Br. *passim, e.g.*, at 42 ("CFC has only ever given one reason for her termination: **expense reimbursement fraud and policy violations.**") (emphasis added). CFC cannot present this conclusion as its reason for termination then argue Wallis "quibbles" with the purported finding, which is the exact purpose of the pretext analysis. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 256 (1981) (The pretext stage of the *McDonnell Douglas* framework gives the plaintiff "the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision."); Appellee's Br. at 42.

CFC is correct that its burden when presenting a legitimate business reason is one of production, not persuasion. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 503 (1993). However, lack of supporting evidence for a proffered legitimate business reason strongly supports a finding of discrimination. CFC's proffered legitimate business reason is that the "fraud was just so egregious, [it had] no choice but to render that termination decision." JA0973. Its failure to produce actual evidence in support of its legitimate business reason (fraud) is therefore highly relevant.

Finally, CFC briefly mentions disputes of fact related to the timing, decisionmakers, and procedures of Wallis's termination. The circumstances surrounding an employee's termination are plainly salient in determining whether there are disputes of material fact. CFC has presented conflicting evidence as to whether it followed procedure, when decided to terminate Wallis, and who, exactly,

21

decided to terminate her, presenting a credibility question for the jury to identify the true motivation for CFC's actions.

**D.  CFC again relies on its biased audit results to justify its preferential treatment of male employees.**

CFC argues that *Haynes* is inapplicable because the Court concluded that the two comparators' conduct was similar. However, CFC does not acknowledge that the Court noted "as an initial matter" that whether Haynes actually committed the conduct of which he was accused was disputed, as it is here, requiring consideration by a jury. *Haynes v. Waste Connections, Inc*., 922 F.3d 219, 224 (4th Cir. 2019). CFC's brief serves only to demonstrate the numerous disputes of material facts in this case by highlighting directly conflicting testimony and evidence. Such "evidence presents a sufficient disagreement to require submission to a jury[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251–52 (1986). Such direct contradictions and differing interpretations of the record is plainly not "so one-sided that one party must prevail as a matter of law." *Id.* at 252. Therefore, whether CFC terminated Wallis based on her sex is a question for a jury.

### III. Wallis has presented enough evidence of CFC's retaliatory motive to overcome summary judgment.

#### A. CFC promulgated its own discriminatory allegations against Wallis, making the retaliation reasonably related to her administrative complaint.

CFC cannot argue that the facts surrounding Wallis's termination (*i.e.*, CFC alleging fraud) have nothing to do with the events surrounding Wallis's retaliation claim. In any field or career, an accusation of fraud is incredibly impactful. As this allegation stems from discriminatory motive and promulgated in the same manner, it is inherently reasonably related to Wallis's administrative complaint.

#### B. Wallis established a *prima facie* case of retaliation.

As to CFC's assertion that Wallis is raising a new "legal theory," courts decline to consider new legal theories at summary judgment stage because the complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations." *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 946 (4th Cir. 2013) (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000). CFC was already put on notice of Wallis's protected activity, both her prior counsel's May 2018 letter and November 2018 EEOC complaint. Considering discovery, the evidence needed when considering either protected activity would not change; CFC and Wallis both sought the dates and contents of any communications between CFC

23

and NRECA/Wright-Hennepin and to what extent these communications interfered with Wallis's employment opportunities. CFC was well prepared to defend against Wallis's allegations of retaliation because she pled retaliation in her original complaint, in addition to the fact that they were directly aware of her May 2018 activity.

Disputing solely the third prong of Wallis's *prima facie* case, a causal nexus, CFC then moves to argue that Wallis has not presented evidence that CFC disclosed any details surrounding Wallis's termination (notably specifying that she cannot provide evidence it disclosed information to *only* Wright-Hennepin – not addressing NRECA). Again, circumstantial evidence prevails: if not CFC, who? Moreover, NRECA *directly referenced* "these allegations" in its justification for not hiring Wallis. JA1375 ("Well, I hear [Wallis and CFC) are involved in litigation and that there is financial fraud being alleged. I would steer clear."), JA1357 ("She and CFC did NOT part on good terms, and if the allegations around her departure are true, then we're best to keep our distance.").

### C. CFC's newly proffered legitimate business reason was waived in the lower court, and it cannot offer its own post-hoc justification based on "inferences" it is not entitled to.

As a preliminary matter, noting a party's waiver of an argument is not "a new issue on appeal." As CFC noted, it has the burden of production for a legitimate

business reason. Wallis need not raise CFC's failure to present a legitimate business reason at the District Court level in order for CFC to have waived this argument on appeal. If applied as such, the concept of waiver would make little sense. Should a plaintiff notify defendant of its own failure to preserve an issue in its briefings, the defendant could then raise these omitted arguments prior to appeal in order to preserve its own argument (such as at oral argument).

CFC argues that its "duty" to NRECA leads to "the reasonable inference is that any alleged communications by CFC were in keeping with its commitment to the NRECA to alert it to issues that might impact member cooperatives." Appellee's Br. at 53. It repeats this bare assertion when addressing Kettler's conversation with Wright-Hennepin. *Id.* at 54. As the movant, CFC is not entitled to the Court's reasonable inferences of facts in dispute and the Court should not take them into consideration.

### D. CFC does not dispute that it violated its own policies and procedures, evidencing pretext, and concedes it did not present a legitimate business reason.

Finally, CFC argues that Wallis's evidence of pretext cannot raise an inference of discrimination but fails to explain why. When considering that only one type of pretext is routinely required by courts and Wallis has presented two concrete types

of evidence related to CFC's sudden justification, a reasonable juror could certainly infer discriminatory motive.

Additionally, it is noteworthy that CFC justifies its failure to present a legitimate business reason because it "had no reason to delve into explanations because Wallis's convoluted retaliation claim puts the cart before the horse by relying upon alleged retaliatory conduct that indisputably occurred before the claim protected activity." Appellee's Br. at 54-55. Such a strategy is within its purview, but does not justify the omission of a legitimate business reason because Wallis had no provided her positions on this claim, *i.e*., her Opposition to Motion for Summary Judgment, at the time of CFC's omission, *i.e.*, its Motion for Summary Judgment.

## CONCLUSION

For the foregoing reasons, Appellant Terilyn Wallis respectfully requests that the decision of the District Court granting CFC's Motion for Summary Judgment be REVERSED and that the case be REMANDED for trial.

Dated: September 20, 2023

Respectfully submitted,

/s/ Anita Mazumdar Chambers
Robert Scott Oswald  (VSB 41770)
Anita Mazumdar Chambers (VSB 89067)
Briana Scholar, Esq.
The Employment Law Group, P.C.
1717 K Street NW, Suite 1110
Washington, D.C. 20006
(202) 261-2821 (telephone)
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
achambers@employmentlawgroup.com
bscholar@employmentlawgroup.com

*Counsel for Appellant*

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains 6,472 words.

2. This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using *Microsoft Word 365* in *14pt Times New Roman*.

Dated: September 20, 2023

Respectfully submitted,

/s/ Anita Mazumdar Chambers
Anita Mazumdar Chambers

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this Wednesday, September 20, 2023, the CM/ECF

system will send notice of such filing to the following registered CM/ECF users:

Susan F. Wiltsie
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, District of Columbia 20037
Email: swiltsie@huntonAK.com
Phone: (202) 955-1546
Fax: (202) 828-3789

Jason P. Brown
Hunton Andrews Kurth LLP
2200 Pennsylvania Avenue, NW
Washington, District of Columbia 20037
Email: brownj@huntonAK.com
Phone: (202) 955-1870
Fax: (202) 778-2201

Trevor S. Cox
Hunton Andrews Kurth LLP
951 East Byrd Street
Richmond, VA 23219
Email: tcox@huntonAK.com
Phone: (804) 788-7221
Fax: (804) 788-8218

> Respectfully submitted,
>
> /s/ Anita Mazumdar Chambers
> Anita Mazumdar Chambers
>
> *Counsel for Plaintiff-Appellant*